[No. C000713. Third Dist. Jan. 26, 1989.]

CALIFORNIA TROUT, INC., et al., Plaintiffs and Appellants, v. STATE WATER RESOURCES CONTROL BOARD et al., Defendants and Respondents;
CITY OF LOS ANGELES et al., Real Parties in Interest and Respondents.

586

**COUNSEL**

Barrett W. McInerney, Morrison & Foerster, F. Bruce Dodge and Patrick J. Flinn for Plaintiffs and Appellants.

John K. Van de Kamp, Attorney General, R. H. Connett, Assistant Attorney General, Peter W. Van Der Naillen and Mary E. Hackenbracht, Deputy Attorneys General, for Defendants and Respondents.

James K. Hahn, City Attorney, Edward C. Farrell, Chief Assistant City Attorney, Kenneth W. Downey, Assistant City Attorney, Kronick, Moskovitz, Tiedemann & Girard, Adolph Moskovitz, Janet K. Goldsmith and James Thompson, for Real Parties in Interest and Respondents.

## OPINION

**BLEASE, J.**—This is a consolidated appeal from judgments dismissing petitions for writs of mandate by which California Trout, Inc., National Audubon Society, and Mono Lake Committee (plaintiffs) would command the State Water Resources Control Board (Water Board) to rescind two licenses, issued to the City of Los Angeles and its Department of Water and Power (collectively referred to as L.A. Water and Power) in 1974, which confirm rights to the appropriation of water. The licenses validate the diversion of water by means of dams from four creeks in Mono County, tributaries to Mono Lake, for the generation of power and for domestic uses by L.A. Water and Power. Plaintiffs contend the licenses violate Fish and Game Code section 5946,[1] which directs that "[n]o . . . license to appropriate water [in portions of Mono and Inyo Counties] shall be issued . . . after September 9, 1953, unless conditioned upon full compliance with Section 5937." Section 5937 mandates that "[t]he owner of any dam shall allow sufficient water at all times . . . to pass over, around or through the dam, to keep in good condition any fish that may be planted or exist below the dam."

The trial court denied the petitions on the view that section 5946 does not apply to the appropriation of water by diversion from dams constructed, as in this case, before September 9, 1953. As we shall explain, this view confuses two distinct requirements of section 5946. The provisions which apply to the *construction* of dams concern their physical capacity to accommodate fish ladders (see § 5938), a matter not at issue here. The provision applicable to a license for the *appropriation* of water by means of diversion from dams is limited only by the date of issuance of the license.

L.A. Water and Power makes three principal arguments supporting the premise that section 5946 should not be construed to affect its licenses.

First, it claims that section 5946 does not apply to licenses which authorize the appropriation of *all of the available water from a stream.* We answer that this reading would nullify the express terms of the section.

Second, it claims that the application of section 5946 to the 1974 licenses would retroactively divest it of rights to the appropriation of water, secured by permits 5555 and 5556, issued prior to the effective date of section 5946, September 9, 1953. The argument fails. L.A. Water and Power gained no

---

[1] All references to sections are to the Fish and Game Code unless otherwise noted. Where the context indicates, references to section by the present section number extend to the statute as originally enacted under a former section number.

rights to the appropriation of water prior to September 9, 1953, since it was not able to put the full amount of authorized water to beneficial use, as required by water law. That occurred for two reasons. First, as L.A. Water and Power informed the Water Board in 1953, in seeking the extension of permit 5555, the full amount of water was not then "required by municipal needs." Second, the project contemplated by the permits lacked the transportation and storage facilities necessary to make consistent beneficial use of the available water. Such facilities, principally the second Los Angeles aqueduct, were not authorized by permits 5555 and 5556 but by "amendments" thereto or new permits issued after September 9, 1953. The second aqueduct was not completed until 1970, 17 years after the enactment of section 5946. The challenged licenses did not issue until some three years thereafter.

Third, it seeks to nullify section 5946 by an implied facial challenge to its constitutional validity. Embedded in this challenge is the claim that the Legislature lacks the constitutional power to make reasonable determinations of the priority of water uses. We uphold the power of the Legislature to make such choices.

The Water Board takes no issue with plaintiffs' substantive claims, but argues that they are time barred. Nonetheless, it concedes that section 5946 does affect the appropriation of water and that it has the present authority to act prospectively to condition the affected licenses on compliance with it. Given the validity of the concession, the public nature of the rights at issue, and that prospective relief is sought by petitioners, the argument is devoid of substance.

For these reasons we will reverse the judgment and direct the trial court to mandate the Water Board to apply section 5946 prospectively to the licenses at issue.

FACTS

The present controversy stems from a long history of actions taken by the City of Los Angeles to appropriate the water of creeks tributary to Mono Lake and of the Owens River for the domestic use of the city and for the generation of electricity.[2]

For our purposes the history commences in 1916. In that year L.A. Water and Power applied for a permit from the State Water Commission to

---

[2] We include as an appendix a diagram of the affected waterways.

appropriate the water of the Owens River for the purpose of generating electricity. The application proposed to take water from Long Valley Reservoir at the head of the Owens River Gorge for use in three hydroelectric power plants to be located in the gorge. The application describes the works (means) of diversion as follows: "for Plant #1, Long Valley Reservoir Dam, for Plants #2 and #3, low concrete with emergency spillway over crest." The proposed completion date for construction was January 23, 1925. For reasons that do not appear in the record, action on the permit was not forthcoming until many years later.

In 1923 L.A. Water and Power applied for two related permits to appropriate the entire flow of Lee Vining Creek, Walker Creek, Parker Creek, and Rush Creek, all tributaries of Mono Lake, for domestic consumption and generation of electricity. The plan of diversion called for a dam on Lee Vining Creek with a tunnel and conduit to carry the water to a reservoir created by a dam on Rush Creek. Along the way, the waters of Walker Creek would be diverted by means of a shaft into the tunnel and of Parker Creek by direct diversion over the side of the conduit. The water was to be diverted from the reservoir on Rush Creek by a tunnel to the headwaters of the Owens River in Long Valley and then, after use in the Owens Gorge power plants, through the Owens River aqueduct system to Los Angeles. The construction of the proposed works was to be completed by July 1, 1933. Once again, initial action on the permits came later than the proposed completion date.

In 1933 the direct predecessor to section 5937 was first enacted. (Stats. 1933, ch. 73, § 525, p. 443.) In 1934 L.A. Water and Power submitted new applications for permits to appropriate the waters of the aforementioned tributaries of Mono Lake. It explains this action as follows. "During design of the Mono Basin project, it became clear that more water storage would be required than had been requested in the 1923 applications. Therefore, in 1934, the City sought to amend its applications to increase storage capacity and also to add the waters of Mill Creek, north of Lee Vining Creek, as part of the project. However, the Water Board asked the City to file new applications instead and assured the City that its municipal status would protect its priority for water rights. The City then filed [the 1934 applications]." The new applications proposed to accomplish the diversion of water from each of the Mono Lake tributary creeks by use of a dam. The construction of diversion works was to be completed within four years after approval of the application and the accomplishment of the appropriation within seven years after such approval.

All of these applications were still pending in 1935 when L.A. Water and Power applied to the State Department of Public Works for approval of

plans to construct the dam on Rush Creek to create Grant Lake Reservoir. The Fish and Game Commission conducted a hearing concerning the necessity of a fishway to allow fish to bypass the proposed dam. The commission found on June 7, 1935, that "a fishway is not practicable and will not be required."

In 1936 L.A. Water and Power applied to the State Department of Public Works for approval of plans to construct the dam on the Owens River at Long Valley. The Fish and Game Commission conducted a hearing, on April 1, 1936, concerning the necessity for a fishway at this dam and a reconsideration of that issue as to the Grant Lake Dam. There was no immediate resolution of these issues. The "tentative" resolution was that the commission staff and L.A. Water and Power should "get together and work out the possibilities of a [fishcultural reservoir] on Hot Creek [a tributary of the Owens River above Long Valley] that was proposed as a structure to be provided in lieu of fishways at these dams . . . ."

In 1940, Water Board hearings were conducted on the pending applications for permits to appropriate the water of the Mono Lake tributary creeks and the water of the Owens River for electricity generation. L.A. Water and Power withdrew the 1923 applications and the applications of 1916 and 1934 were approved, except for the denial of the proposed appropriation of waters of Mill Creek. Permits for these projects were issued on June 1, 1940. These permits, numbers 5555 and 5556, for appropriation of the waters of the Mono Lake tributary creeks, provide that the construction work "shall be completed on or before December 1st, 1945" and that "[c]omplete application of the water to the proposed use shall be made on or before December 1st, 1948." The amount of water to be appropriated under these permits is limited to "the amount which can be beneficially used" and in any event may not exceed 200 cubic feet per second by direct diversion and storage of 93,540 acre-feet per year. L.A. Water and Power did not comply with the deadlines within which the proposed use was to be completed. However, as appears, the permits were periodically amended, by the Water Board, to extend these deadlines, once before September 9, 1953, and several times thereafter.

The applications for approval of plans for construction of Grant Lake Dam and Long Valley Dam were also finally resolved in 1940. The Fish and Game Commission adopted an order on August 19, 1940, apparently embodying a negotiated agreement that in lieu of fishways for these dams L.A. Water and Power would provide rights to and partial funding for the establishment of a fish hatchery on Hot Creek. Thereafter, on November 25, 1940, L.A. Water and Power and state officials executed a contract to carry

out the agreement establishing the hatchery. The agreement provided: "That [L.A. Water and Power] shall be and is hereby fully and unconditionally relieved and released of any and all obligations, under and by reason of the provisions of [the Fish and Game Code], excepting [former] Sections 528, 531, and 535 to 548, inclusive, by reason of the construction, operation, and maintenance of said two dams, in addition to and over and above those set forth in said order and this agreement, and if [L.A. Water and Power] complies with the provisions of said order and this agreement the State will not at any time whatsoever or at all make any demands upon said [L.A. Water and Power] in addition thereto or beyond those so agreed upon herein."

Grant Lake Dam and Reservoir construction had been started in 1935 and was completed in 1940. Long Valley Dam and Reservoir construction was apparently commenced in 1936 and completed in 1941.

Prior to the beginning of diversion of water from the Mono Lake tributary streams each had good trout populations, sustained almost entirely by natural propagation. All were extensively fished by the public. As recently as 1985 trout have inhabited portions of Lee Vining Creek and Walker Creek below the diversion dams, apparently surviving on springs, seepage, spillage, and local runoff. Walker Creek and Parker Creek join Rush Creek before it empties into Mono Lake. Land adjoining all four creeks downstream of the points of diversion is owned by the City of Los Angeles. Some land adjoining the lower reaches of Lee Vining Creek and Rush Creek below the points of diversion is owned by the federal government.

In October 1952 the subject of the drying up of the Owens River Gorge as a result of L.A. Water and Power's appropriations was raised during a hearing conducted by the State Senate Interim Committee on Fish and Game. During the hearing counsel for L.A. Water and Power was asked if it planned to "dry up" Rock Creek. Counsel said that L.A. Water and Power still had on file an application for diverting Rock Creek. Counsel was asked if the Owens Gorge applications had called for diversion of all water from the gorge. Counsel answered that the application had called for a diversion of more than the mean runoff figure for Long Valley. L.A. Water and Power gave economic costs of lost power as the reason why no water could be permitted to flow down the gorge.

When the conmittee chairman asked where else in California a river had been dried up in such fashion as the Owens Gorge, L.A. Water and Power countered with its report on improved fisheries as a result of Hot Creek hatchery and Long Valley Reservoir. During the hearing "Aubrey Lyon, in

behalf of Bishop Izack Walton League chapter, made a strong appeal for some water to be left in the Gorge for benefit of wildlife. He requested the committee to aid attempts to secure provisions in state laws establishing a priority in the use of water for the benefit of fish, plant and wildlife. He pointed out that if the City could dry up the Gorge, all streams are in jeopardy of being dried up, and then 'we'd have no wildlife in this area.' "

In 1953 the Senate Interim Committee on Fish and Game issued a report to the Legislature that cited as a major problem in the Inyo-Mono area the development of the stream in the Owens River Gorge for power purposes. The report recounted the history of the project and asserted that the planned program would result in the diversion of all water from the gorge, removing the area as a fishing ground. The report suggested that there was still an opportunity to negotiate "for the maintenance of a minimum stream flow through the Owens River Gorge to preserve this portion of the stream as a fishway." However, it appears that the complete diversion of the stream from the gorge was accomplished in August 1953.

In the water years between 1940-1941 and 1962-1963 the amount of water diverted from the Mono Lake creeks out of the Mono Basin varied from a low of zero to a high of 96,900 acre-feet. The median amount was 64,400 acre-feet in the water year 1952-1953. The average yearly amount diverted for this period was approximately 51,000 acre-feet. The discrepancy between the amounts of water actually diverted and the theoretical maximum amount of acre-feet per year that could have been diverted under the 200 cubic feet per second limit in the permits for appropriation was attributable to the inability of L.A. Water and Power's facilities outside of the Mono Basin to handle any greater amounts of water. This situation led representatives of the Water Board and the Department of Water Resources to warn L.A. Water and Power "to take steps to develop its full entitlement to the waters of the Mono Basin or risk the potential that other appropriations might be granted rights by the Water Board." Because of those warnings, the city's need for additional water, and the presence of many of the conveyance facilities required for the development of additional water resources from Inyo and Mono Counties, in 1963 the city authorized construction of the second Los Angeles aqueduct project.

The reason for this is contained in a declaration by D. L. Georgeson, Assistant General Manager of L.A. Water and Power; "As originally conceived, planned, and executed, [this] project required the construction of no new facilities in the Mono Basin. Principal construction was to increase the capacity of the conveyance canal from Alabama Gates near Lone Pine into Haiwee Reservoir and to construct a new aqueduct, roughly paralleling the

First [Los Angeles aqueduct], to carry the water to the City of Los Angeles. The project was anticipated to develop an additional approximately 150,000 [acre-feet per year] for the City from three principal sources in approximately three equal parts or approximately 50,000 [acre-feet per year] apiece. These sources were increased groundwater pumping from the Owens Valley Groundwater Basin, operational savings within Inyo County, and *increased average diversions from the Mono Basin . . . .*" (Italics added.) The means of conveyance of this increased diversion to Los Angeles, the second Los Angeles aqueduct, was completed in 1970. Thereafter, L.A. Water and Power was able to put to beneficial use the full appropriation of waters allowed by the diversion and storage limits of permits 5555 and 5556. In the water years 1970-1971 through 1973-1974 Mono Basin diversions in acre-feet respectively were: 94,300; 104,500; 101,700; and 123,600.

In 1974 the Water Board issued licenses 10191 and 10192 asserting that L.A. Water and Power had made proof, as of May 2, 1973, of a right to take water at the rate of 189 cubic feet per second by diversion and to store 89,200 acre-feet per year of the aggregate flows of the Mono Lake tributary creeks, under permit 5555 and somewhat lesser included amounts under permit 5556, as these permits had been amended and "extended" by action of the Water Board after September 9, 1953.

We will relate the facts pertinent to the amendments and the extensions of these permits later in this opinion. This will occur in the discussion of L.A. Water and Power's argument that their effect was to preserve an existing right to water so as to preclude the application of section 5946 to the succeeding licenses.

DISCUSSION

I.

*The Construction of Section 5946*

L.A. Water and Power asks us to construe section 5946 as inapplicable to its 1974 licenses, issued 21 years after the enactment of the section.

■ The task of construing a statute requires that we " 'read and examine the text of the act and draw inferences concerning meaning from its composition and structure' " as applied to the material facts of a case. (*Nunez* v. *Superior Court* (1983) 143 Cal.App.3d 476, 480 [191 Cal.Rptr. 893], quoting from 2A Sutherland, Statutory Construction (4th ed. 1973) § 47.01, p. 70.) Where the application of the text to the facts is clear, it must

be so applied.[3] That is the case here. As will be seen, the difficulty with L.A. Water and Power's statutory claims is that they either do not address or satisfactorily account for the language of section 5946.

## A.

*Section 5946 Expressly Applies to the Licenses at Issue*

The controlling language of section 5946 is contained in its *second* sentence. It forbids the issuance of a "permit *or* license" (italics added) after September 9, 1953, to "appropriate water in District 4½ . . . unless conditioned upon full compliance with Section 5937." Section 5937 mandates that "[t]he owner of any dam shall allow sufficient water at all times to pass through a fishway, or in the absence of a fishway, allow sufficient water to pass over, around or through the dam, to keep in good condition any fish that may be planted or exist below the dam."

These provisions straightforwardly limit the amount of water that may be appropriated by diversion from a dam in the designated area by requiring that sufficient water first be released to sustain fish below the dam.

Notwithstanding its express language L.A. Water and Power claims that section 5946 does not apply to a permit or license which authorizes the appropriation of *all* of the available water of a stream. The argument has two parts: (1) section 5946 only reiterates section 5937 as it applied before the enactment of section 5946; (2) section 5937 does not apply to limit the appropriation of water.

---

[3] It bears repeating that the meaning of a statute derives from its text. "As was said long ago, and often repeated, ' "[i]t is elementary that there can be no intent in a statute nor expressed in its words; that the intention of the legislature must be determined from the language of the statute. . . ." (*Seaboard Acceptance Corp.* v. *Shay* (1931) 214 Cal. 361, 365 [5 P.2d 882].)' " (In-Home Supportive Services v. *Workers' Comp. Appeals Bd.* (1984) 152 Cal.App.3d 720, 739 [199 Cal.Rptr. 697].) If the language of a statute is plain with respect to a claimed application, which is to say unambiguous in that *context,* the courts have a duty to so apply it. This does not rule out extrinsic indications of meaning, but it does place the statutory text at the center of the inquiry. In simple terms, the statutory language must always be accounted for. These rules derive from fundamental constitutional principles of separation of powers. The statute is the unit for expression of the legislative will for "[t]he Legislature may make no law except by statute . . . ." (Cal. Const., art. IV, § 8.) The legislative will is perforce manifested *in* the language of the statute. "For constitutional reasons, the ascertainment of legislative meaning necessarily focuses on the enacted statute and not on an unenacted expression of legislative will, however reliable. An unenacted utterance has force, if at all, only as part of the proper context of the statute." (Dickerson, The Interpretation and Application of Statutes (1975) p. 144.) Thus, criteria of meaning, predicated upon sources external to the statute, may be used only to resolve a semantic or contextual ambiguity which appears from its claimed applications to the material facts of a case. (Cf. *National Auto & Cas. Ins. Co.* v. *Contreras* (1987) 193 Cal.App.3d 831, 835-837 [238 Cal.Rptr. 627].)

Section 5937, so its argument goes, establishes a rule only for the operation of dams, presupposing and addressed to the usual circumstances in which sufficient *un*appropriated water remains to keep some fish below the dam alive if carefully disgorged. (See Friant Dam, 18 Ops.Cal.Atty.Gen. 31, 36-39 (1951); cf. generally Instream Flow Requirements, 63 Ops.Cal.Atty.Gen. 95 (1980); but see State Water Resources Control Board Water Appropriation Regulation, 57 Ops.Cal.Atty.Gen. 577, 578-583 (1974); cf. Comment, *Use It or Lose It: California Fish and Game Code Section 5937 and Instream Fishery Resources* (1980) 14 U.C.Davis L.Rev. 431.) Thus, in the face of the express direction of section 5946 to apply the conditions of section 5937 to limit the appropriation of water, L.A. Water and Power would have us construe it so as to apply only to *un*appropriated water.

It accomplishes this transmutation by severing section 5937 from the effect given it by section 5946, reading section 5937 as if it were *not* made applicable by section 5946 to permits or licenses for the appropriation of water. That reading is embedded in its argument that the meaning to be given section 5937 is that which *preceded* the enactment of section 5946.

L.A. Water and Power reasons that until 1937 the predecessor of section 5937, section 525, only addressed the release of water through fishways. (Cf. Stats. 1933, ch. 73, p. 443 with Stats. 1937, ch. 456, p. 1400.) In 1937 the present language extending section 525 to all releases of water "over, around or through the dam" was enacted. In 1937, and for many preceding years, the Water Code provisions pertaining to appropriation declared as state policy that the use of water for domestic purposes is the highest use of water and the use of water for irrigation purposes is the next highest use. (Stats. 1921, ch. 329, § 1, p. 443.) It apparently was assumed in some quarters at the time of adoption of those sections that the appropriation of water for "higher" domestic or irrigation uses must be approved regardless of the detriment to "lower" uses, e.g., in-stream use for fishery or recreation purposes. (Cf. *National Audubon Society* v. *Superior Court* (1983) 33 Cal.3d 419, 428 [189 Cal.Rptr. 346, 658 P.2d 709], [hereafter Audubon] disclosing this as the view held by the Water Board in 1940.) Given this assumption, so it is claimed, section 5937 is not meant to operate as a rule affecting the appropriation of water.[4]

---

[4] The Water Board does not presently take this position, either here or in its regulations. Since 1975 the board has by regulation recognized that section 5937 alone conditions the issuance of permits for the appropriation of water. Title 23, section 782 of the California Code of Regulations provides, in pertinent part, that "[i]n compliance with Section 5937 . . . *all* permits for diversion of water from a stream by means of a dam which do not contain a more specific provision for the protection of fish shall require the permittee to allow sufficient water at all times to pass . . . over, around, or through the dam to keep in good condition any fish

We need not reach the question of the application of section 5937 alone as a rule affecting the appropriation of water. In any event the manifest flaw in the argument is that, regardless of the original scope of application of section 5937, the purpose of its incorporation into section 5946 is, as section 5946 says, to "condition," and therefore limit, the "appropriat[ion]" of water by the priority given to the preservation of fish as set forth in section 5937.

Section 5946 provides that "[n]o permit or license to appropriate water in District 4½ shall be issued . . . after September 9, 1953, unless conditioned upon full compliance with Section 5937." One does not show compliance with a rule by claiming that it is inapplicable. Compulsory compliance with a rule requiring the release of sufficient water to keep fish alive necessarily limits the water available for appropriation for other uses. Where that effects a reduction in the amount that otherwise might be appropriated, section 5946 operates as a legislative choice among competing uses of water. L.A. Water and Power's argument would render section 5946 senseless, a conclusion we are not permitted to reach.

The purpose that is manifest in the language of section 5946 also appears as an explicit chapter in the legislative history of its enactment. As introduced, the bill by which former section 526.5, the predecessor to section 5946, became law carried an urgency clause explaining its necessity. It said: "Proposals for diversions of water in District 4½ are now being considered which, if effected will destroy all of the fish life in large sections of the streams in that district and interfere with the economy in area which is dependent to a large extent on recreation. *It is necessary that this act take effect immediately to prevent further destruction of fish life in District 4½.*" (Sen. Bill No. 78 (1953 Reg. Sess. as introduced Jan. 6, 1953, italics added.) As the recitation of facts shows, this bill followed interim committee hearings at which were discussed both the impending diversion of water in the Owens River Gorge, for which permits had already issued and some dams completed, and planned diversions from another stream in the district.

The urgency clause was later deleted and language inserted to preclude the application of (current) section 5947, which prohibits *excessive* releases of water so "as to destroy fish life below such release," to the operation of

that may be planted or exist below the dam . . . ." (Register 87, No. 10—3-7-87; formerly § 762.5 adopted by Register 75, No. 17—4-26-75, italics added.) The notion that certain provisions of the the Water Code should be read in isolation to provide the exclusive regulation of the appropriation of water is suspect. The Water Code must be read as a whole. Since the water law was codified in 1945, Water Code section 6501 has stated: "The provisions for the installation of fishways over or around dams and for the protection and preservation of fish in streams obstructed by dams are contained in . . . the Fish and Game Code."

the generating facilities of a hydroelectric project then under construction.[5] However, the provisions of (current) section 5946 remained fully applicable. Thus the legislative policy to "prevent further destruction of the fish life in District 4½" by "sufficient releases" of water from dams remained as embodied in section 5946. The deletion of the urgency clause affected only the effective date of the section and not its purpose or legal effect.[6] The urgency clause, as part of the history of section 5946 available to the Legislature, emphasizes what the language of the section tells us, that it was meant to apply as a rule preventing the destruction of fish by the appropriation of water for other uses by permits or licenses issued after September 9, 1953. That purpose could not be achieved if, as L.A. Water and Power would have it, the rule allowed the appropriation of *all* of the water of a stream.[7]

---

[5] The qualifying section provided: "The provisions of Section 526.6 [now § 5947] shall not be applicable to the operation of any hydroelectric generating facilities in connection with which there is under construction, on the effective date of this bill, a regulatory dam to control the flows below the point where water is released from such facilities, until such regulatory dam is completed, or June 30, 1955, whichever event occurs first." This provision was deleted in 1957. (Stats. 1953, ch. 1663, § 3; Stats. 1957, ch. 456, § 5947.)

[6] In 1953 the effective date of the legislation without an urgency clause was September 9, 1953. In 1957 this date was inserted in place of the language "effective date." (Stats. 1957, ch. 456, § 5946, p. 1400.)

[7] This conclusion also surfaces in secondary reports of the debate in the Assembly concerning the bill by which the statute was enacted. We note that this extrinsic source of meaning is of far less value than those previously related because of its ephemeral extra-record character and because remarks of individual legislators, even when disclosed to a house of the Legislature, do not necessarily reflect the views of other legislators. (See *In Re Marriage of Bouquet* (1976) 16 Cal.3d 583, 589-590 [128 Cal.Rptr. 427, 546 P.2d 1371].)

From a synopsis of the Assembly debate it appears that the floor sponsor, Assemblyman Lindsay, asserted that the bill was to protect a stream from drying up in Mono and Inyo Counties. When questioned by another member about whether the bill would give a priority to fish over domestic uses of water Assemblyman Lindsay reportedly replied "that the bill simply continues a policy already established in the law and would not give any right to appropriate water for fish purposes, and that therefore there would be no priority for fish."

Questioned further about the effect of the provisions on water law Lindsay read from an opinion prepared by the Legislative Counsel. The pertinent component of that opinion is: "It must be recognized that it is possible that there might be some conflict between the provisions of the bill and the requirements of Section 3 of Article XIV of the Constitution (which requires that water be used for a beneficial purpose) if the water was required, for example, for human consumption and the court found that under such circumstances the use of the water for fish life was not a reasonable beneficial use (see *Tulare Dist.* v. *Lindsay-Strathmore Dist.* (1935) 3 Cal.2d 489, 567 [45 P.2d 972]). However, since the bill contains a severability clause, the possible conflict does not affect the constitutionality of the bill in instances where its provisions can be properly applied."

These remarks are somewhat ambiguous concerning Assemblyman Lindsay's reading of the proposed bill as to its effect as a rule of water allocation. On the one hand Lindsay asserted there would be *no* priority for fish; on the other hand he asserted the enactment would prevent the drying up of the stream. However, immediately thereafter other members flatly asserted that the bill would give fish a priority over all other uses. "Assemblyman Lowrey then took the floor in opposition to the bill, stating that he had an opinion from the legal staff of

In view of the language and syntax of section 5946, the history of its enactment, and the extrinsic evidence of contemporaneous views of its purpose, we reject as untenable the argument that section 5946 does not apply in the case in which all of the water of a stream is sought to be appropriated.

### B.

*Section 5946 Applies to Licenses Predicated Upon Permits Issued Before September 9, 1953*

L.A. Water and Power suggests that section 5946 does not apply to *any* case in which a postenactment license is predicated upon a permit issued prior to the effective date of the section, September 9, 1953. That argument succeeds only if the disjunctive "permit or license" in the second sentence is exclusively read in the conjunctive as "permit *and* license." It cannot be so read, even if "or" is read as "and/or."[8]

Section 5946 says that "[*n*]*o permit or license to* appropriate water in District 4½ shall be issued . . . after September 9, 1953" unless conditioned by full compliance with section 5937. (Italics added.) It facially applies to a license issued after the specified date without regard to whether it is based upon a permit issued prior to that date. L.A. Water and Power would have us write a condition into the statute precluding such an application. If that were meant to be the case, the natural phrasing would be "no permit and license" or, more precisely, "no permit and ensuing license." It does not so read and the legislative circumstances in which section 5946 was enacted militate against such a reading.

---

the State Engineer that the bill would give fish priority over all other uses. He stated that there was a constitutional question involved, in the opinion of the attorneys for the State Engineer. He then suggested that the bill should be amended to take out the first section. [¶] Assemblyman Thomas spoke briefly in favor of the bill on the ground that if it is not enacted fishing on the stream in question might be destroyed. [¶] Assemblyman Hansen objected to the bill on the ground that it would establish a bad precedent, and that the Department of Fish and Game would follow it up with later requests to the Legislature for the same provisions in other areas. [¶] Assemblyman McFall objected to the bill on the ground that it would give priority to fish over domestic uses, and on the ground that the present law provides adequate protection for fish life. [¶] Roll was then called and the bill was passed by a vote of 42 to 14."

In the aggregate this account of the debate on the bill in the Assembly supports the conclusion that the importation of the rule of section 5937 was meant to result in the application of that rule to the allocation of water.

This view also finds extrinsic support, albeit the source is of vanishing small significance, in the various assertions of parties opposing and supporting the Governor's veto of the bill. Both groups, including the Department of Fish and Game, which supported the bill, and the State Water Resources Control Board, which opposed it, based their position on the premise that the bill affected a change in the law of appropriation of water.

[8] " 'And/or' is taboo" in legislative drafting. (See Cal. Code Com. Rep. (1949) p. 34.)

As discussed above, section 5946 was meant "to prevent further destruction of the fish life in District 4½" insofar as that could be accomplished by the attachment of section 5937 conditions to postenactment licenses. The legislative hearings preceding the enactment of section 5946 were addressed inter alia to the amelioration of projects already begun, necessarily involving permits issued prior to its enactment.

C.

*The Trial Court Incorrectly Limited the Application of Section 5946 to the Appropriation of Water Obtained by Diversion From Dams Constructed After September 9, 1953*

■ The trial court held that section 5946 applies only to licenses for the appropriation of water from dams constructed after September 9, 1953. That result is predicated upon the extension of conditions applicable only to the *construction* of dams, as provided in the first and third sentences, to the appropriation of water *from* dams, as provided in the second sentence.

Section 5946 presently reads in full: "The provisions of Section 5938 shall not be applicable to dams constructed in District 4½[9] after September 9, 1953. [¶] No permit or license to appropriate water in District 4½ shall be issued by the State Water Rights Board after September 9, 1953, unless conditioned upon full compliance with Section 5937. Plans and specifications for any such dam shall not be approved by the Department of Water Resources unless adequate provision is made for full compliance with Section 5937."[10]

---

[9] "District 4½" consists of portions of the Counties of Mono and Inyo not included in other districts (§ 11012), embracing all of the dams and tributaries subject to this action. (§ 11012.) A " '[d]am' includes all artificial obstructions." (§ 5900, subd. (a).)

[10] Section 5946 is a restatement and continuation of former Fish and Game Code section 526.5, enacted in Statutes of 1953, chapter 1663, section 1. (See § 3.) The sections referred to in section 5946 are restatements and continuations of the sections referred to in section 526.5. (§ 3; former §§ 526.5, 526, 525, Stats. 1933, ch. 73; Stats. 1937, ch. 456.)

Section 526.5, as contained in Statutes of 1953, chapter 1663, provided: "Section 1. Section 526.5 is added to the Fish and Game Code, to read: [¶] 526.5. The provisions of Section 526 shall not be applicable to dams constructed in District 4½ after the effective date of this section. [¶] No permit or license to appropriate water in District 4½ shall be issued by the Department of Public Works after the effective date of this section unless conditioned upon full compliance with Section 525. Plans and specifications for any such dam shall not be approved by the Department of Public Works unless adequate provision is made for the full compliance with Section 525. [¶] Sec. 2. Section 526.6 is added to the Fish and Game Code, to read: [¶] 526.6. It is unlawful for the owner of a dam in District 4½ to release water from the dam, or any facilities for the generation of hydroelectric energy operated in connection therewith, in varying flows in such a manner as to destroy fish life below such release. [¶] Sec. 3. The provisions of Section 526.6 shall not be applicable to the operation of any

Each sentence of section 5946 pertains to action consigned to a different unit of state government. The first sentence pertains to action within the domain of the Fish and Game Commission. The second sentence to action within the domain of the Water Board. The third sentence to action within the domain of the Department of Water Resources. The second and third sentences are joined in one paragraph apparently because they pertain to related units of state government. As we have explained above, the provision which governs the appropriation of water is the second sentence. That sentence contains no words of limitation tied to the construction of dams. Rather, such limitations are contained in the first and third sentences which are directed to the construction of fishways which must be built during construction of the dam.

Section 5937 is addressed to the release of water *from* dams. Although the section refers to fishways it does so only as an avenue for the release of water from a dam. Section 5937 does not mandate the construction of a fishway but requires that dam owners must "at all times" release sufficient water "to keep in good condition any fish that may be planted or exist below the dam" whether that is accomplished by means of a fishway or other means of release.[11]

Fishways is the subject of another provision of the Fish and Game Code, section 5938, to which the first and third sentences of section 5946 are directed. The first sentence of section 5946 says that the provisions of section 5938 shall *not* apply to dams constructed after September 9, 1953.

---

hydroelectric generating facilities in connection with which there is under construction, on the effective date of this bill, a regulatory dam to control the flows below the point where water is released from such facilities, until such regulatory dam is completed, or June 30, 1955, whichever event occurs first. During any such period of construction prior to June 30, 1955, operation of any hydroelectric generating facilities shall be accomplished in such a manner as to cause the least possible variance in the flow of water released, consistent with the proper operation of the facilities. [¶] Sec. 4. If any provision of this act, or the application thereof to any person or circumstance, is held invalid, the remainder of the provisions, or the application of such provision to other persons or circumstances, shall not be affected thereby."

[11] In pertinent part section 5937 is a restatement and continuation of the provisions contained in former section 525, as it existed at the time of the issuance of permits 5555 and 5556. (See Stats. 1933, ch. 73, § 525, p. 443, amended by Stats. 1937, ch. 456, § 1, p. 1400.) Section 5937 provides: "The owner of any dam shall allow sufficient water at all times to pass through a fishway, or in the absence of a fishway, allow sufficient water to pass over, around or through the dam, to keep in good condition any fish that may be planted or exist below the dam. During the minimum flow of water in any river or stream, permission may be granted by the department to the owner of any dam to allow sufficient water to pass through a culvert, waste gate, or over or around the dam, to keep in good condition any fish that may be planted or exist below the dam, when, in the judgment of the department, it is impracticable or detrimental to the owner to pass the water through the fishway." The term " 'Fish' [as used in § 5937] means wild fish, mollusks, crustaceans, invertebrates, or amphibians, including any part, spawn, or ova thereof." (§ 45.)

Section 5938 authorizes the development of a fish hatchery in lieu of the construction of a fishway over or around a dam, if that proves impracticable.[12] The removal of that option compels the building of a fishway whenever "there is not free passage for fish over or around any dam . . . ." (§ 5931.) A fishway enables free passage for fish around a dam. That, of course, like the provision of section 5937 for water below the dam, is for the benefit of fish populations. But that common purpose does not make for a common means.

The third sentence of section 5946 says that "[p]lans and specifications for [the construction of] any *such* dam" must comply with section 5937. (Italics added.) "[S]uch dam" refers to the provisions of the first sentence, for that is the only other reference in section 5946 having to do with the construction of dams. Since section 5937 requires the release of water from a dam for use in the maintenance of fish populations below, it is obvious that to accomplish that purpose the dam should be appropriately designed and constructed. Hence the requirement that plans for "such" dams provide for full compliance with section 5937 means that they shall be designed and constructed so as to have a fishway (and) or other physical means of conveying water past the dam for use in maintenance of the fish population below the dam.

## D

*There Is No Administrative Construction of Section 5946 Supportive of the Reading Urged by L.A. Water and Power*

■ We also find unpersuasive the argument that we should defer to a claimed long-standing administrative interpretation of the statute. L.A. Water and Power suggests that the Water Board has consistently interpreted section 5946 as inapplicable to licensing proceedings stemming from permits issued before the effective date of the statute. The Water Board does not join in this claim.[13]

---

[12] Section 5938 provides: "Whenever in the opinion of the commission it is impracticable, because of the height of any dam, or other conditions, to construct a fishway over or around the dam, the commission may, in lieu of the fishway, order the owner of the dam completely to equip, within a specified time, on a site to be selected by the department, a hatchery, together with dwellings for help, traps for the taking of fish, and all other equipment necessary to operate a hatchery station, according to plans and specifications furnished by the department. After such hatchery has been constructed, the department shall operate it without further expense to the owner of the dam except as provided in Sections 5940 and 5941."

[13] The Water Board's legal posture in these proceedings is to disassociate itself from any construction of section 5946. Counsel for the board argued at oral argument that section 5946 is extraneous to the substantive problems which plaintiffs seek to remedy, i.e., the

The claim is predicated upon a memorandum legal opinion of counsel to the Water Board dating from December 1953, which L.A. Water and Power asserts had been endorsed de facto by the actions of the Water Board.[14] In the memorandum counsel concluded that, where a dam had been constructed without facilities for compliance with section 5946 under a permit issued before the enactment of that statute, the subsequent issuance of a license need not be conditioned upon such compliance. The counsel's opinion is not persuasive for two reasons.

It does not address the prospective application of section 5946 to the circumstances presented here. It does not consider the application of section 5946 to cases in which a dam as constructed is *capable* of being operated in a manner allowing compliance with section 5946.

Nor is it binding on the courts. The ultimate resolution of a question of statutory meaning is a judicial question. " '[A]n erroneous administrative construction does not become decisive no matter how long continued.' " (*People* v. *Union Oil Co.* (1957) 48 Cal.2d 476, 480 [310 P.2d 409].) "An administrative officer may not make a rule or regulation that alters or enlarges the terms of a legislative enactment." (*Whitcomb Hotel, Inc.* v. *Cal. Emp. Com.* (1944) 24 Cal.2d 753, 757 [151 P.2d 233, 155 A.L.R. 405].)

The policies which underlie judicial deference to administrative constructions of statutes are not served by deference to the opinions of legal counsel for an administrative agency which inform the agency that it is constrained by law to adopt a certain construction. In such a situation the agency has not selected between policies based upon its expertise or delegated political authority; it has merely adhered to a view of the general law advanced by counsel. As to such matters the court, rather than the staff counsel for an agency, is the superior arbiter.

---

failure of the permits to require compliance with section 5937. The reason asserted is that section 5937 applies to all appropriations in any event on a continuing basis, hence it is unnecessary to consider the effect of section 5946. This is consistent with the fact that Water Board regulations now provide that *all* permits, not just those which pertain to District 4½, must be conditioned on compliance with section 5937. (Cal. Code Regs., tit. 23, § 782; see fn. 4, *ante*.)

[14] L.A. Water and Power suggests that the opinion has been endorsed by the Water Board because, as to 61 licenses in District 4½ issued on permits granted before September 1953, no condition appears on the face of the license which says that it must comply with the rule requiring the release of water to preserve fish life. L.A. Water and Power contrasts this absence with the consistent presence of such a condition in licenses on permits issued in District 4½ after the date of enactment of section 5946. However, the inference that the presence of conditions in these licenses is attributable to an application and construction of section 5946 is not compelled. The perceived consistency is marred by the fact that one such license does contain such a condition.

## II

*The Application of Section 5946 to the L.A. Water and Power Licenses Does Not Retroactively Alter Rights Claimed to Be Acquired Under Permits Issued Prior to September 9, 1953*

### A.

■ L.A. Water and Power next argues that section 5946 cannot be applied to licenses issued to it in 1974 because they confirm rights acquired under permits which were issued prior to the enactment of section 5946 on September 9, 1953. L.A. Water and Power appeals to the rule that a statute ordinarily should not be construed to apply so as to unfairly change the legal significance of material facts occurring before its enactment. The unfairness, it is claimed, lies in the divestment of rights acquired under permits 5555 and 5556 issued to L.A. Water and Power prior to September 9, 1953.

■ The rule is a rule of construction, which applies only when it is not clear whether a statute applies restrospectively. (See *In re Marriage of Bouquet, supra*, 16 Cal.3d at p. 587 ["the presumption against the retroactive application of statutes" is subordinated "to the transcendent canon of statutory construction that the design of the Legislature be given effect"]; see also 58 Cal.Jur.3d, Statutes, § 23, p. 341, citations omitted.)[15] Where such an ambiguity exists, and the statute can be read to affect pre-enactment rights, values of fairness emanating from due process principles of fair notice aid in the determination whether the statute was meant to be so applied. (See generally Retrospectivity and Retroactivity of Civil Legislation Reconsidered, 2 Sutherland, Statutory Construction (4th ed. 1986) Legal Commentary, p. 171.)

■ The rule is of no aid to L.A. Water and Power unless section 5946 is ambiguous. As related, the history of the section strongly suggests that section 5946 is meant to be applied to all projects of appropriation in District 4½ that had not proceeded to license status prior to its effective date. In the circumstances of this case, the only reasonable reading of the statute is that it was meant to apply precisely as it is written: *"No . . . license to appropriate water in District 4½ shall be issued by the [Board]*

---

[15]The doctrine is further predicated upon the assumption that only private rights are at stake. For purposes of this analysis we assume them to be. However, we note that the waters at issue are subject to the public trust doctrine, a point developed in section VI of this opinion, *post,* pages 626-632. Whether a party can obtain vested rights such as to trigger the retrospectivity doctrine in such a case is a question we need not resolve.

after September 9, 1953, unless conditioned upon full compliance with Section 5937." (Italics added.)

As appears, it is immaterial in this case whether the statute might be viewed as ambiguous with respect to its application to some projects commenced prior to its enactment. To tender an argument that language is ambiguous, a litigant must show that the statute could reasonably be read in a manner favorable to it as applied to the facts tendered. L.A. Water and Power cannot do so for it cannot show that it obtained rights under the permits as issued prior to the enactment of section 5946. For the purpose of examining this argument, we shall assume that it is unclear whether section 5946 was meant to apply to the case in which the post-enactment license merely confirmed rights acquired prior to enactment by actions taken pursuant to pre-enactment permits. In further pursuit of the argument we additionally assume that section 5946 could reasonably be read as not intended to apply to the issuance of a license to an appropriator who (1) had received a permit prior to the enactment, (2) expended significant sums in the reasonable expectation of full completion of the project as described in the permit, and (3) that project, as described in the permit, would enable the licensee to put the water authorized to be appropriated to full beneficial use in an amount that would not allow full compliance with section 5937. These conditions are minimally necessary to implicate the policies which give rise to the presumption against retroactivity. As appears, the assumption of ambiguity in the statute is unavailing in this case.

### B.

#### *The Test of Retroactivity*

The test of retroactivity is whether section 5946 operates retroactively to materially alter the legal significance of a prior event. That problem arises because "[l]aw operates in the flow of time, and a single controversy may involve a series of events, and occasions for official decision, occurring at many different points in the flow." (Hart & Sacks, The Legal Process (tent.ed. 1958) p. 640.) The problem is to discern the materiality of events with respect to the policy advanced by the presumption of prospectivity. (8) The source of the presumption is the "general consensus that notice or warning of the rule should be given in advance of the actions whose effects are to be judged." (2 Sutherland, Statutory Construction, *supra*, § 41.02, p. 340.) Application of a statute is retroactive only when it gives a different and potentially unfair legal effect to actions taken in reliance on the pree-nactment law. (*Mahon* v. *Safeco Title Ins. Co.* (1988) 199 Cal.App.3d 616, 620-623 [245 Cal.Rptr. 103].)

■ That could occur here only if the application of section 5937, via section 5946, would substantially alter the legal effect of actions taken by L.A. Water and Power pursuant to permits 5555 and 5556 as they read before the September 9, 1953, enactment of section 5946, e.g., reduces or obliterates a right to the appropriation of water obtained under the permits as they then read, acquired incident to the pre-enactment construction of works of diversion and the (appropriative) use of water made available thereby. As we will show at length, it did not.

To show why not implicates the water law by which such rights are acquired, a subject we next examine.

C.

*The Statutory Scheme for Acquiring Water Rights*

The exclusive method of acquiring rights to appropriate or use water is by compliance with the statutory scheme in the Water Code. (Wat. Code, § 1225.)

The process is initiated by application to the Water Board for a permit to put unappropriated water to beneficial use. (Wat. Code, § 1252.) The application must set forth, inter alia, the nature and amount of the proposed use, the location and description of proposed works to accomplish diversion, the time for completion of construction, and the time for the complete application of the water to the proposed use. (Wat. Code, § 1260.) The Water Board must act upon the application and may grant, or refuse to grant, a permit and may reject any application after a hearing. (Wat. Code, §§ 1250, 1350.)

"Upon the approval of an application the board shall issue a permit." (Wat. Code, § 1380.) The permit gives the right to take and use water only to the extent and for the purpose granted and under the terms and conditions of division 2 of the Water Code as specified in the permit (Wat. Code, §§ 1381-1391), and the right is conditional.

To perfect the right, the permittee must diligently commence and complete construction of the project and apply the water to beneficial use in accordance with the law and the terms of the permit. (Wat. Code, §§ 1395-1397; *Madera Irr. Dist.* v. *All Persons* (1957) 47 Cal.2d 681, 690-691 [306 P.2d 886].)

The board requires the filing of annual progress reports by each permittee detailing the progress made in complying with the conditions of a permit.

(Cal. Code Regs., tit. 23, § 782.) "A permit shall be effective for such time as the water actually appropriated under it is used for a useful and beneficial purpose in conformity with [Division 2 of the Water Code] but no longer." (Wat. Code, § 1390.) As applicable to the permits and licenses at issue, Water Code section 1241 formerly provided: "When the person entitled to the use of water fails to beneficially use all or any part of the water claimed by him, for which a right of use has vested . . . for a period of three years, such unused water reverts to the public and shall be regarded as unappropriated public water." (Stats. 1943, ch. 368, § 1241, pp. 1615-1616.) The Water Board may reserve jurisdiction to amend, revise, supplement, or delete terms and conditions in a permit in specified circumstances by decision or order. (Wat. Code, § 1394.) "[Construction of the works of diversion] shall be completed and the water applied to beneficial use in accordance with this division, the rules and regulations of the board, and the terms of the permit and within the period specified in the permit." (Wat. Code, § 1397.) These periods may be extended by the Water Board for good cause shown. (Wat. Code, § 1398.)

"There shall be cause for revocation of a permit if the work [of diversion] is not commenced, prosecuted with due diligence, and completed or the water applied to beneficial use as contemplated in the permit and in accordance with this division and the rules and regulations of the board." (Wat. Code, § 1410, subd. (a); Stats. 1986, ch. 670, § 4.) "Immediately upon completion of the construction of works and application of the water to beneficial use the permittee shall report the completion to the board." (Wat. Code, § 1600.) "If the determination (of the board) as to completion is favorable to the permittee, the board shall issue a license which confirms the right to the appropriation of such an amount of water as has been determined to have been applied to beneficial use." (Wat. Code, § 1610.)

"As soon as project construction and application of the water to full beneficial use have been accomplished, the information is reported to the board (Wat. Code, § 1600), and the board's staff conducts an inspection (Wat. Code, § 1605). If the board finds that the permittee has completed construction and has applied the water to beneficial use in accordance with the law and the permit, it issues a license which confirms the appropriation. (Wat. Code, § 1610.) If the findings are favorable to the permittee, the issuance of the license is mandatory and ministerial. (Wat. Code, § 1610, Cal. Admin. Code, tit. 23, § 2712, subd. (c).)" (*Environmental Defense Fund, Inc.* v. *East Bay Mun. Utility Dist.* (1980) 26 Cal.3d 183, 197-198 [161 Cal.Rptr. 466, 605 P.2d 1].)

We accept, for purposes of the argument under consideration, L.A. Water and Power's synopsis of the general effect of actions concerning permits

and licenses. "California law, as it exists today and as it existed in 1953, provides that appropriative water rights are acquired by placing water to beneficial use in accordance with the terms of a permit granted by the Water Board. It is the granting of the permit, not the issuance of the license, which 'gives [the permittee] the right to take and use the amount of water specified in the permit.' (Water Code Section 1455.) The right then vests when the water is actually diverted and placed to beneficial use." L.A. Water and Power assumes that in view of these considerations it had acquired a vested right to divert the entire flow of the Mono Lake tributary streams before 1953 when section 5946 came into effect. We do not concur in this critical assumption.

### D.

*The Project Contemplated by the Permits Issued Prior to September 9, 1953 Was Insufficient to Accomplish the Full Appropriation of Water Authorized*

#### 1.

Although the diversion works authorized by permits 5555 and 5556 were completed prior to September 9, 1953, they were insufficient to accomplish the full appropriation of water authorized by the permits and such water was not in fact appropriated to beneficial use until 1973, 20 years after the effective date of section 5946.

That delay was occasioned because the second Los Angeles aqueduct, the facility necessary to the full transport of water from the diversion dams to the domestic uses specified in the permits, was not completed until that year. As a consequence, the actual beneficial use of 50,000 acre-feet of water by which rights to its appropriation are acquired did not, because it could not, occur until completion of the second aqueduct. That aqueduct was *not* within the projects listed in permits 5555 and 5556 issued in 1940. Its construction was prompted, inter alia, by the consideration that the plans and projects contemplated in the permits as they issued prior to the enactment of section 5946 on September 9, 1953, had not resulted in a successful appropriation by beneficial use of the amount of water in the Mono Lake tributary creeks. Accordingly, application of section 5946 to the L.A. Water and Power licenses, insofar as they sought to affirm an appropriation essentially based on *post* enactment conduct, is simply not a retroactive application of the statute.

L.A. Water and Power argues in a petition for rehearing that the 50,000 acre-feet of water which we assert could not be put to beneficial use is not

the measure of the shortfall of the original project. It argues that in three of the years preceding the enactment of section 5946, but not the years inmediately preceding September 9, 1953, it had in fact diverted from the affected streams and put to beneficial use water in the amount of 95,000 acre-feet and that a right to this amount was thereby vested and that section 5946 cannot be retroactively applied to its permits so as to divest it of this right. There are numerous flaws in this argument.

If L.A. Water and Power obtained vested rights as claimed, the question arises—why did it not seek licenses immediately following the (claimed) high use years (1948-1951) rather than extensions for failure to beneficially use the water authorized by the permits? The answer is that L.A. Water and Power could not consistently use the flows of the Mono County streams, and we are told why. In its brief to this court, L.A. Power and Water says: "During several of the years between 1941 [when the dams were completed] and 1970 the City diverted virtually its full Mono Basin entitlement authorized by the 1940 water rights permits, but found it could not do so consistently without constructing additional conveyance capacity downstream from the Mono Basin. In response to advice from the Water Board, and because the City needed the additional firm water supply, the City, in 1963, authorized the Second Los Angeles Aqueduct (LAA) Project. (Decl. of D.L. Georgeson, . . . .) The project was to develop an additional approximately 150,000 acre feet annually, *of which approximately 50,000 AFY would come from the already authorized diversions in the Mono Basin.* (Decl. of D. L. Georgeson . . . .) [¶] The Second LAA was completed and placed into service in June 1970. Since that time, the City has exported a long term average of approximately 100,000 AFY from the Mono Basin for use by the people of the City of Los Angeles. (Dec. of D. L. Georgeson . . . .)" The reference to the declaration of D.L. Georgeson is a reference to a declaration tendered to the trial court by L.A. Water and Power, from which we quote on this point in the facts. D.L. Georgeson is, or was at the time of the declaration, the Assistant General Manager—Water of L.A. Water and Power with direct responsibility and supervision of all of the water system operations of the City of Los Angeles.

Georgeson's assertions are borne out by the history of the permit process by which L.A. Water and Power ultimately obtained the licenses under review. L.A. Water and Power conceded in its applications for extension of the initial permits *beyond* September 9, 1953, that it was not entitled to the full amount of water authorized to be appropriated under its initial permits until completion of the second aqueduct because it could not put that water to beneficial use in Los Angeles and because it lacked the conveyance facilities to transport the water. The needed conveyance facilities were not

constructed until growth in the population of Los Angeles, occurring long after the enactment of section 5946, spurred the city to develop the second aqueduct in anticipation of even more future growth.

All of this is reflected in the applications and progress reports tendered the Water Board incident to the claimed "extension" of permits 5555 and 5556 beyond September 9, 1953, as next we show.

2.

### The Permit Extensions

During the hearing of this appeal we inquired whether the permits had expired, since, on the record before the court, the full appropriation of water was to have been completed prior to September 9, 1953. L.A. Water and Power replied that the permits had been extended on numerous occasions by action of the Water Board. Thereafter, it moved that we take additional evidence on appeal relating thereto pursuant to Code of Civil Procedure section 909. It proffered orders of the Water Board granting extension of permits 5555 and 5556. We granted the motion.

Thereafter, on this court's motion, after notice to the parties, we adduced additional evidence relating to the orders, the applications for extension of time (23 Cal. Code Regs. § 842) and annual progress reports (*id.,* § 847) filed by L.A. Water and Power with the Water Board as required by its regulations.[16]

As related, the regulations of the Water Board provide for progress reports and petitions for the extension of permits showing the progress of

---

[16]L.A. Water and Power objects to this court's consideration of the applications for extension of time and related progress reports. It argues that these documents are (1) irrelevant because they do not address the time period it feels is pertinent, i.e., 1948 through 1951 and (2) "the progress reports alone are not the best evidence of the amounts of diversion and use . . . ." L.A. Water and Power misunderstands the court's purpose in securing the documents. The documents were not adduced for the purpose of showing the amounts of water diverted prior to 1953. Rather, they show the representations made to the Water Board by L.A. Water and Power, in the manner provided by Water Board regulations, in applying for the extensions of its permits beyond September 9, 1953, and upon which the Board presumably acted in granting them. The representations bear on its argument that the application of section 5946 to its licenses unfairly deprives it of rights obtained by virtue of the *original* permits. L.A. Water and Power obviously cannot base that argument upon rights granted them after September 9, 1953. Hence, the relevancy and "best evidence" objections are not well taken and are overruled. L.A. Water and Power's related motion to take additional evidence of the facts of its water usage in the time period *before* September 9, 1953, is founded upon the same misconception and for that reason is denied. We note that the record already contains ample evidence concerning the matters of concern to L.A. Water and Power during the 1948 through 1951 time period.

projects for the appropriation of water and the beneficial use of the water authorized under the permit. Permits 5555 and 5556 were extended on several occasions pursuant to either petitions or progress reports treated as petitions.[17]

The petitions and progress reports consist of pre-printed questions to which the applicant must respond. The information thus provided bears on the issues in this case as follows. On each of the forms L.A. Water and Power was asked the question "Have you used as much water as you expect to use under this permit?" In each instance, save the last, the answer was "No." With respect to each of the orders granting an extension of a permit pursuant to these applications, the order specifies that it was an "Order Granting Extension of Time Within Which to Complete Use of Water."[18]

In the case of both permits L.A. Water and Power gave as reasons for the extension the need to construct additional facilities to permit the beneficial

---

[17]Some of the extensions were made pursuant to documents labeled petition for extension of permit. Others, as apparent from notations made on certain of the progress reports, suggest they were considered by the Water Board *as* petitions.

[18]Permit 5555, the domestic use of water permit, was the subject of seven orders concerning the extension of time. The first four orders entitled "Order Granting Extension of Time Within Which to Complete Use of Water" ["Use Order"] are dated and in similar terms grant extensions respectively as follows: November 9, 1948, extension to December 1, 1953; January 14, 1954, extension to December 1, 1958; July 29, 1959, extension to June 1, 1960; and October 21, 1960 to June 1, 1961 "within which to complete application of water to the proposed use under said permit." The next order, entitled "Order Granting Extension of Time Within Which to Complete Construction and Use" ["Construction and Use Order"] is dated September 28, 1961, and grants extension until December 1, 1962, "to complete construction work and application of water to the proposed use under said permit." The next order is a "Use Order" order dated April 3, 1964, and grants extension of time until December 1, 1968, "within which to complete application of water to the proposed use under said permit." The last order is entitled "Order Approving a New Development Schedule" ["New Development Order"], is dated May 11, 1970, and asserts that "a new development schedule be and the same is hereby approved as follows: [¶] Construction work shall be completed on or before December 1, 1971. [¶] Application of the water to the proposed use shall be completed on or before December 1, 1975."

Permit 5556, the power use permit, was also the subject of seven orders concerning extension of time. The first extension is a "Use Order" dated December 15, 1948, and grants extension to December 1, 1953, "within which to complete construction work and to apply the water to complete beneficial use under said application and permit." The next three orders are "Construction and Use Orders" dated and, in identical language, extending time respectively as follows: July 29, 1959, extension to June 1, 1960; October 21, 1960, extension to June 1, 1961; and September 28, 1961, extension to December 1, 1962, "within which to complete construction work and application of water to the proposed use under said permit." The next order is a "Use Order" dated April 3, 1964, and grants extension to December 1, 1967. The last two orders are "New Development Orders." These are dated and grant extension respectively as follows: February 6, 1968, construction to be completed by December 1, 1969, and use completed by December 1, 1969; May 11, 1970, construction to be completed by December 1, 1971, and use to be completed by December 1, 1975.

use of the full amount of authorized water. With respect to both permits the reason given was the need to construct additional transportation and storage facilities, principally the second aqueduct. With respect to permit 5556, concerning the production of electrical power, the additional reason given was the need to raise the height of Long Valley Dam in order to store more water.

Thus, the first "extension" of permit 5555 issued after enactment of section 5946 on September 9, 1953, was preceded by progress reports, in the form of answers to printed questions, which, for the years, 1952, 1953, and 1954 provide "No" in answer to the question "Have you used as much water as you expect to use under this permit?" Identical responses are provided in the progress reports for subsequent years. The progress report for 1953, the year of enactment of section 5946, provided: "Is construction *complete*?" (original italics) "Yes." "Have you used as much water as you expect to use under this permit?" "No." "If not, when will such use be full and complete?" "*When required by municipal needs.*" (Italics added.)

The petition for extension of permit 5555 filed in 1958 provided in answer to the question "Estimated year in which full use of water will be made - Uncertain—dependent on runoff and municipal needs." The petition for extension of permit 5555 filed in 1962, together with the progress report of that year, provided a further reason for the requested extension. "The steady growth in population and water use in Los Angeles dictates that it will be necessary in the relatively near future to make provision for increased importation of water into the City. Hydrologic studies indicate that maximum beneficial use of existing water rights of the City and maximum diversions for beneficial use under the above permits [including 5555] would provide a substantial portion of the water needed for Power and Municipal use, but such deliveries would require additional Aqueduct capacity. [¶] With this in mind the Board of Water and Power Commissioners . . . approved the recommendation . . . that studies be made to determine the design and cost and the most feasible route of aqueduct facilities . . . ."

A later petition for extension provided: "Preliminary studies have been completed and detailed Engineering Studies are now being made for enlargement of the L.A. Aqueduct. Upon completion of this enlargement all water available under this application will be used." The progress report for 1963 provided that "Work has begun on a Second Los Angeles Aqueduct . . . . Construction is scheduled to start in July 1964 and to be completed sometime in 1968."

Permit 5556 was also extended. The progress report for the year 1953 asserted that "It is proposed to increase the height of Long Valley Dam to

provide greater storage capacity." The report also answered "No" in response to the question—"Have you used as much water as you expect to use under this permit?" and "When the project is completed" in answer to the question "If not, when will such use be full and complete?" Similar answers were given in the progress reports for 1954, 1955, 1956, 1957 and later years. The applications and progress reports thereafter parallel those submitted in connection with permit 5555 chronicling the planning and construction of the second aqueduct. The petition for extension of time filed in 1967 provided as follows: "Reasons why use of water was not completed within time previously allowed: Enlargement of the present Los Angeles Aqueduct is now under way with completion estimated in 1969. Upon completion of this project, all water available under this application will be used."

From the record before us, permit 5555 expired, inter alia, on June 1, 1960, and what is labeled as an extension of that permit is impliedly a new permit because it is premised upon a new construction project. Similarly, permit 5556 expired on December 1, 1953, and the so-called extension, not issued until July 29, 1959, is a new permit since it is premised upon the new project of raising the height and thereby the storage capacity of Long Valley Dam. Moreover, that "extension" expired on June 1, 1960, and a further "extension" of September 28, 1961, is a further new permit since it is premised upon construction of a new project, the second aqueduct. These facts bear on the question of the rights granted under the original permits 5555 and 5556, as next we show.

3.

*L.A. Water and Power Gained No Rights to the Appropriation of Water by the Extensions of Permits 5555 and 5556*

As related, a permit gives a right to take and use water only for the purpose specified in the permit "and the right is conditional. *To perfect the right, the permittee must diligently commence and complete construction of the project and apply the water to beneficial use* in accordance with the law and the terms of the permit." (*Environmental Defense Fund, Inc., supra,* 26 Cal.3d at p. 197, italics added.) Whatever claims L.A. Water and Power may make to the ephemeral peak use of available water from the project as originally specified, that project was incapable of achieving the consistent beneficial use of the available water until completion of the second aqueduct. There is recognition of this fact in the actions taken by the Water Board after the enactment of section 5946. The record shows that the project as conceived in the original permits was substantially changed by

orders issued after the advent of section 5946. The unmistakable implication of the documents in the record is that these changes were in essence the construction of the second aqueduct.

L.A. Water and Power's legal theory is that the maximum amount of water taken in any year under a permit is the measure of the vested appropriation right. This claim relies wholly upon cases in which the physical project had been completed and the parties claiming appropriative rights had used *all* of the available water permitted by the variant flows of the source from which the water was diverted for the project. (See e.g., *Tulare Dist.* v. *Lindsay-Strathmore Dist.* (1935) 3 Cal.2d 489, 548-549 [45 P.2d 972] ["appropriators have for many years used, as a group, the entire flow of the river up to [the permitted] 2,000 cubic feet per second, whenever it was available, and all lesser flows when that quantity was not available . . . ."].) This case differs materially in that the inability to beneficially use all of the authorized and available water was *not* a function of variant flows but the result of a physical inability to transport the water so as to put it to beneficial use in the City of Los Angeles. That inability was ended by completion of the second aqueduct. However, that event came two decades after the enactment of section 5946.

The logical extension of L.A. Water and Power's legal theory would permit an appropriator of water from a complex of sources to lock up artificially high "vested" water rights from each of the sources by manipulating the sources from which it elected to draw its water levels despite the inability to apply such waters to beneficial use. Such cold storage is not permitted by law.

The circumstances here are not materially different from those which would obtain if L.A. Water and Power had sought licenses in 1953 based upon its completed works of diversion and actual diversion of water that could be accomplished thereby and then in 1963 had applied for permits to appropriate an additional 50,000 acre-feet per year. Section 5946 would apply to the later permit and license in that circumstance and no plausible claim of retroactivity could be maintained.

That is essentially what occurred here, except that, through the conduct of the Water Board and L.A. Water and Power, the original permit process was first allowed to tarry interminably and then improperly employed to authorize a new project, which required a new permit, under the guise of "extending" the original project. As noted, the initial permits, 5555 and 5556, were purportedly extended by act of the Water Board on several occasions, all but one of which occurred after September 9, 1953. Reliance

on these so-called "extensions" is unwarranted. It is apparent that the "extensions" were unjustified under the pertinent regulations of the board and the statutes calling for diligence in the completion of water projects. What L.A. Water and Power obtained was not an extension of its permits, i.e., the right to complete its *original* project. Rather it was the beneficiary of *new* permits authorizing or predicated upon an expanded project. The term "extension" in this context is a palpable misnomer.

The so-called "extensions" of permits 5555 and 5556 violated applicable Water Board regulations. The first regulations of the Water Board, addressed to the requirement of reasonable diligence, were promulgated in 1945. They provide a pithy statement of the reasonable diligence requirement. "It is not the purpose of the Water Code to provide a means whereby a reservation of water may be made by one who has no immediate plan or purpose to proceed promptly and diligently with construction of the necessary diversion works and beneficial use of the water. The [Water Board] is disposed to be liberal in its allowances of time both for completing an application and for making full beneficial use of the water where progress is being made, or where a serious effort is being made to overcome obstacles which prevent progress, but the Water Code does not allow the [Water Board] to countenance any attempt to place rights in cold storage where there is no intent to proceed promptly with development." (Former Cal. Admin. Code, tit. 23, § 778, as promulgated in 1945.) The gist of this rule has remained a part of Water Board regulations, albeit the precise wording and regulation numbers have changed. (See, e.g., § 778, Reg. 29, No. 2, 7/12/52; Cal. Code Regs., tit. 23, § 840.) Despite this regulatory recognition that the statutory requirement of diligence does not allow the Water Board to countenance a scheme placing water rights in "cold storage" for future use, that is precisely how L.A. Water and Power seeks to use the various acts purporting to grant extensions to permits 5555 and 5556.

The "extension" of permit 5555 granted L.A. Water and Power which carried it past September 9, 1953, was predicated upon a progress report which provided, in question and answer form: "Have you used as much water as you expect to use under this permit?" "No." "If not, when will such use be full and complete?" "When required by municipal needs." Subsequent progress reports, submitted in connection with later extensions of that permit uniformly report that full use of the water authorized by the permit would be made *after* completion of the second aqueduct.

The administrative act of extension ordinarily has the effect of extending the time to acquire rights to appropriate water not yet used (see generally *Eaton* v. *State Water Rights Board* (1959) 171 Cal.App.2d 409, 415-416

[340 P.2d 722] [affirming rights so acquired as against a competing private claim to appropriate until revoked by the Water Board]). But where a purported act of "extension" occurs, as here, after the effective date of legislation affecting the conditions of such appropriation, and the "extension" entails a new or different scheme of appropriation, the legislation is wholly prospective in its effect. To conclude otherwise would be to indulge the anomaly that the presumption against retroactivity operates to sanction rights acquired only by action taken *after* the date of enactment.

In summary, L.A. Water and Power gained no rights to appropriate the water in issue prior to September 9, 1953, because it was unable to use the water by which such rights might have been obtained. As related, the perfection of a water right requires the actual use and diversion of the water for which a permit to appropriate has been issued. Here, despite the completion of the works of diversion as proposed in the permit to appropriate the entire flow of these streams, L.A. Water and Power was unable to accomplish ongoing beneficial use of 50,000 acre-feet per year of the flow of the streams. Beneficial use of that water could not be accomplished by the works of diversion planned and accomplished under the permits pending in 1953. The reason for this is that L.A. Water and Power had no physical means by which to export and use more than this amount of water and hence could not appropriate the theoretical maximum amount of water contemplated by the permits. That awaited the completion in 1973 of the second aqueduct to Los Angeles.

Hence, assuming that section 5946 is ambiguous with respect to its effect upon "vested" water rights, its application to the licenses at issue makes no cognizable alteration of the legal significance of the underlying preenactment permits. The only appropriative rights that might invoke a retroactivity claim leave available some 50,000 acre-feet of water per year to satisfy the requirements of section 5946. We are given no reason to suppose that this is an insufficient amount of water to satisfy those requirements. Since L.A. Water and Power's claim of retrospectivity would seek to avoid the plain meaning of the statute by a claim of latent ambiguity, it must bear the burden of demonstration. That burden cannot be met on the facts here.

In fact, it was not until 10 years after the enactment of section 5946 (and 15 years after the date of completion of the projects originally authorized by the permits) that L.A. Water and Power was bestirred to *begin* the action necessary to acquire the water right it proffers as "vested" at the time of enactment of section 5946. Permitting such a relation back would not serve the goals of fairness that underpin the presumption that statutes are intended to operate prospectively.

## III

### *The State Is Not Estopped to Apply Section 5946 to the Permits at Issue*

L.A. Water and Power next comes at the problem by framing the issue as a question of equitable estoppel. It claims that the state is estopped to apply section 5946 to the licenses principally because of the Hot Creek hatchery agreement.

We note at the outset that strictly speaking the Hot Creek hatchery agreement could not amount to an estoppel with respect to the future exercise by the Legislature of the law-making power. The only manner in which that power could be fettered is by a constitutional constraint, e.g., by a valid contract authorized by the Legislature. Assuming for the purpose of argument that the estoppel doctrine were applicable, the Hot Creek hatchery agreement would not suffice to invoke it.

We start with yet another assumption, that the hatchery agreement was valid when consummated. The fruit of the Hot Creek agreement was approval of the plans for the dams and applications for appropriations of water under consideration at that time. However, as related, the appropriations actually accomplished pursuant to those applications allowed sufficient unappropriated waters to remain to keep fish below the dams on the Mono Lake tributary creeks in good condition.

The benefit of the Hot Creek hatchery bargain was a permit to complete a present scheme of appropriation of water, not a permit to kill fish and destroy fish habitat whether necessary or not. As it turned out, it was not necessary to destroy the fish habitat in the Mono Lake creeks as contemplated because the scale of appropriation did not pan out. There is no term of the contract which says L.A. Water and Power may carry forward a "right" to destroy fish habitat in connection with future schemes for appropriation of water. Much less does the contract say that such a right would override the law concerning appropriation of water at such point in the future.

Moreover, as to the application of section 5946, an estoppel argument cannot succeed since that would effectively nullify the statute and estoppel doctrine does not reach so far. "[N]o court has expressly invoked principles of estoppel to contravene directly any statutory or constitutional limitations." (*Longshore* v. *County of Ventura* (1979) 25 Cal.3d 14, 28 [157 Cal.Rptr. 706, 598 P.2d 866]; also cf. e.g., *State of California* v. *Superior Court* (*Fogerty*) (1981) 29 Cal.3d 240, 244-247 [172 Cal.Rptr. 713, 625 P.2d

256].) The reason for this constraint is that statutory law is available to all and allowing estoppel to contravene directly a statutory limitation would confer upon agency officials a pernicious power to repeal statutes pro tanto. (See *County of San Diego* v. *California Water etc. Co.* (1947) 30 Cal.2d 817, 826-827 [186 P.2d 124, 175 A.L.R. 747]; also cf. *City of Long Beach* v. *Mansell* (1970) 3 Cal.3d 462, 498-499 [91 Cal.Rptr. 23, 476 P.2d 423].)

IV

*L.A. Water and Power's Implied Challenge to the Authority of the Legislature to Determine the Priority of Water Uses, as in Section 5946, Founders on the Provision of the California Constitution Upon Which It Relies, Article X, Section 2*

The remaining argument advanced by L.A. Water and Power is that if section 5946 were construed as requiring a minimum in-stream flow for preservation of fish it would be unconstitutional by virtue of California Constitution, article X, section 2. It provides that water rights, "shall not extend to the waste or unreasonable use or unreasonable method of use or unreasonable method of diversion of water." L.A. Water and Power argues that the Legislature may not impose a categorical priority for one use of water because reasonableness of use requires comparison of contending alternative uses which is an adjudicative question that cannot be constrained by a statutory rule. Indeed, L.A. Water and Power submits that use of minimal stream flows for preservation of fish in these circumstances is an unreasonable use in view of its need to use the water for domestic consumption. These arguments are unpersuasive. We find no preclusion in article X, section 2 of legislative power to make rules concerning what uses of water are reasonable, at least so long as those rules are not themselves unreasonable. We cannot say that section 5946 is unreasonable in requiring a minimal in-stream flow for preservation of fish in the areas it affects.

We note at the outset that it is an open question whether the test of unreasonable use under article X, section 2 refers only to inordinate and wasteful use of water or applies comparatively to preclude any use less than the optimum allocation of water. (See *Audubon, supra,* 33 Cal.3d at p. 447, fn. 28.) Indeed, L.A. Water and Power was of the view in *Audubon* that a comparative application was inappropriate. (*Ibid.*) It apparently wished to rely on the Legislature's general rule in Water Code section 106, as between competing applications for appropriation of water, that use of water for domestic purposes is the highest use of water as establishing per se that such use is always a reasonable use. Yet here, it takes the opposite view concerning the comparative application of article X, section 2 and advances a legal

theory that would sweep aside all legislative rules concerning reasonableness of water use. Setting aside these ironies, and assuming for the sake of argument that article X, section 2 applies comparatively, we find no arguable merit in the claim that section 5946 would conflict with that constitutional provision because it calls for minimum in-stream flow for preservation of fish.

Article X, section 2 (enacted in 1928 as art. XIV, § 3) was a response to the decision of the California Supreme Court in *Herminghaus* v. *South. California Edison Co.* (1926) 200 Cal. 81 [252 P. 607]. (*Audubon, supra,* 33 Cal.3d at p. 442.) *Herminghaus* held that the Legislature had no power to divest riparian owners of the right to "the customary flow of water which is or may be beneficial to his land." (200 Cal. at pp. 100-101.) The doctrine of reasonable use which limited uses among riparians was found inapplicable as between a riparian and an appropriator. (*Ibid.*) This riparian right was seen as a property right introduced by the adoption of the common law, which was vested and which was not subject to divesting via the exercise of the police power. (*Id.,* at pp. 95, 117.) Hence, the Legislature could not "arrogate to itself the right to determine what are the 'useful and beneficial purposes' . . . to which . . . already vested rights shall be limited in their use and enjoyment . . . ." (*Id.,* at p. 117.) Since the riparian right was a vested property right it could not be taken without compensation; rather it could only be taken by eminent domain. (*Id.,* at pp. 111-112.) *Herminghaus* was overturned by article X, section 2. (*Audubon, supra,* 33 Cal.3d at p. 442.) The claim that such alteration was a taking was rejected in *Gin S. Chow* v. *City of Santa Barbara* (1933) 217 Cal. 673, 700-705 [22 P.2d 5].

L.A. Water and Power relies on *Gin S. Chow, supra,* for the assertion that the question of reasonableness cannot be constrained by statute. The last argument considered in *Gin S. Chow* was that the newly enacted constitutional amendment was fatally vague because the terms "reasonable" and "unreasonable" provided no adequate standards. The Supreme Court answered as follows: "[W]hat is a useful and beneficial purpose and what is an unreasonable use is a judicial question depending upon the facts in each case. Likewise, what is a reasonable or unreasonable use of water is a judicial question to be determined in the first instance by the trial court. There would seem to be no more difficulty in ascertaining what is a reasonable use of water than there is in determining probable cause, reasonable doubt, reasonable diligence, preponderance of evidence, a rate that is just and reasonable, public convenience and necessity, and numerous other problems which in their nature are not subject to precise definition but which tribunals exercising judicial functions must determine." (217 Cal. at p. 706.)

L.A. Water and Power takes this as a rule that the question of reasonableness invariably must be resolved ad hoc, adjudicatively, and there is no place for the legislative articulation of rules concerning reasonableness. That certainly is not the holding of *Gin S. Chow,* which did not consider such a question. The rule proffered is unsupported by apposite authority and insupportable in reason and legal doctrine.

All that the reasoning in *Gin S. Chow* connotes is that in the absence of an a priori rule a court may ascertain whether a use of water is unreasonable from the facts and circumstances of particular cases. Hence, it is often asserted that "[w]hat constitutes a reasonable use or method of diversion is ordinarily a question of fact." (*United States* v. *State Water Resources Control Bd.* (1986) 182 Cal.App.3d 82, 130, fn. 24 [227 Cal.Rptr. 161].) Actually, since what occurs is development of a standard of reasonableness on the facts of the case it should be described as a making of law for the particular case. (See Traynor, The Riddle of Harmless Error (1970) p. 71.) The typical example of such a process is case-by-case determination of the standard of reasonable care in the law of tort. However, the fact that, ordinarily, the standard of reasonableness is fixed ad hoc does not impel the view that the Legislature has no power to fashion rules concerning reasonableness, e.g., by enacting statutory safety obligations which become the basis of negligence per se.

L.A. Water and Power cites no case holding a statute unconstitutional as inconsistent with article X, section 2 for promulgating a rule concerning the reasonableness of water use. The contrary view is implicit in *Joslin* v. *Marin Mun. Water Dist.* (1967) 67 Cal.2d 132 [60 Cal.Rptr. 377, 429 P.2d 889]. After adverting to *Gin S. Chow* for the proposition that reasonableness of water use is a "question of fact" (*Joslin,* at p. 139), the opinion says: " . . . such an inquiry cannot be resolved *in vacuo* isolated from statewide considerations of transcendent importance." (*Id.,* at p. 140, original italics.) The inquiry must be resolved in view of "policy pronouncements relative to the use and conservation of natural waters . . . ." (*Ibid.*) In view of absence of any public policy favoring amassing of sand and gravel (the contending use) that use "is as a matter of law unreasonable within the meaning of [article X, section 2]." (*Id.,* at p. 141.)

■ Ordinarily, absent a plain constitutional mandate, a conflict in public policy between the view of the judiciary and the Legislature must be resolved in favor of the latter. (See e.g., *Gin S. Chow, supra,* 217 Cal. at p. 698.) ■ Where various alternative policy views reasonably might be held whether the use of water is reasonable within the meaning of article X, section 2, the view enacted by the Legislature is entitled to deference by

the judiciary. An invitation to substitute the policy view of a court in this circumstance for a reasonable policy enacted in a statute is an invitation to return to the benighted days of substantive due process.

It is yet another irony that the claim to such authority is founded on article X, section 2, an amendment enacted to vest the "right" in the Legislature, over the judicial objection in *Herminghaus*, to determine the useful and beneficial purposes of water use. Article X, section 2 explicitly assigns to the Legislature the right and obligation to enact laws in further-ance of its policy. "This authorization discloses that the framers of article X, section 2, recognized that the promotion of its salutary policies would require granting the Legislature broad flexibility in determining the appro-priate means for protecting scarce water resources." (*In re Waters of Long Valley Creek Stream System* (1979) 25 Cal.3d 339, 351-352, fn. omitted [158 Cal.Rptr. 350, 599 P.2d 656].) ■■■ That is to say, there is "broad legis-lative authority for the conservation and regulation of scarce water re-sources . . . ." (*Id.*, at p. 352, fn. 6.) That authority is sufficient to autho-rize the Legislature to enact statutes which determine the reasonable uses of water. (See generally, *Audubon, supra,* 33 Cal.3d at pp. 443 and 447-448, fn. 30.)

■■■ Of course, the Legislature's broad authority is not unlimited. If a statute sanctioned a manifestly unreasonable use of water, it would transgress the constitution. That is not the case here. The Legislature's policy choice of the values served by a rule forbidding the complete drying up of fishing streams in Inyo and Mono Counties in favor of the values served by permitting such conduct as a convenient, albeit not the only feasible, means of providing more water for L.A. Water and Power, is manifestly not unreasonable. Accordingly, we have no warrant to override the Legislature's rule in section 5946 concerning that balance.

V

In sum, none of the considerations urged by L.A. Water and Power impels the conclusion that we should construe section 5946 as inapplicable to its licenses which derive from permits issued before its effective date but which were extended and modified to physically accomplish the goals of beneficial use of the available waters thereafter. The statute directs that "no permit or license" shall be issued in District 4½ after September 9, 1953, unless the appropriation is compatible with release of sufficient water to keep fish below the dams in good condition. For the foregoing reasons, we are constrained so to apply it. The licenses in 1974 met the criteria of section 5946 for application of the rule against diversion of water destruc-

tive of fish habitat. Accordingly, those licenses should have been conditioned upon compliance with the criteria of section 5937. The remaining question is whether the defect in the licenses may be cured in these proceedings.

## VI

### *The Action Is Not Untimely*

■■■■ The Water Board contends that the judgment of dismissal should be upheld on grounds that plaintiffs' action is untimely.[19] L.A. Water and Power adopts the contention and arguments of the Water Board by reference. The premise underlying the claim is that plaintiffs seek judicial review of the Water Board's *1974* action granting issuance of the licenses. The Water Board demurred on this ground and the demurrer was overruled. The trial court reasoned that the demurrer was not well taken because the petitions alleged facts showing a *continuing duty* of the Water Board to apply section 5946 to the licenses, if that statute were applicable at the time of the issuance of the licenses. We agree.

The Water Board takes a curious position. It concedes, indeed it insists, that these licenses are subject to its "ongoing" power of revocation, a greater power than need be exercised in order to cure the failure to attach the conditions required by section 5946. It reasons: "Section 5937 as a water allocation statute necessarily implements California Constitution Article X, section 2, requiring the reasonable use of water. Similarly section 5937 is a legislative expression of the public trust protecting fish as trust resources when found below dams. (*Audubon, supra,* 33 Cal.3d at p. 446, note 27; *People* v. *Truckee Lumber Co.* (1897) 116 Cal. 397, 400-401 [48 P. 374]). Therefore, the enforcement of section 5937 is within the jurisdiction of the [Water] Board which has an ongoing duty to ensure the reasonable use of water and the protection of public trust values in water allocation decisions."

This reasoning a fortiori applies to the less sweeping conclusion that section 5946 is a water allocation statute, i.e., the conclusion we have earlier reached. It follows that the Water Board must view its 1974 action of issuing the licenses as open to a *present* correction to bring them into conformity with section 5946. However, the Water Board submits that plaintiffs cannot obtain such relief by means of this action because that

---

[19] The Water Board does not contend that plaintiffs have failed to exhaust an available administrative remedy. (See *Audubon, supra,* 33 Cal.3d at pp. 449-451.)

would "call for the Board to look backward and review its past decisions which have become final by the passage of time." This proffered distinction between forward-looking and backward-looking remedies is contrived and unpersuasive. As we will show, the appropriate remedy is wholly prospective and ministerial in effect.

But first we examine the Water Board's arguments in detail. The Water Board places principal reliance upon Water Code section 1360. It provides in pertinent part: "Any person interested in any application may, within 30 days after final action by the board, file a petition for a writ of mandate . . . ." The Water Board suggests that "final action by the board" means final action by the Water Board in *any* proceeding pertaining to any stage of the process by which the right to water is secured or by which such a right is revoked. It implies that such a reading is impelled by an implicit policy of the statutory scheme to give finality to its actions in determining the allocation of water rights. The Water Board misreads the section and, moreover, argues the contrary policy. Section 1360 has nothing to do with licenses, let alone the revocation of licenses, the relief sought by plaintiffs. It applies only to the initial, i.e. *application,* stage of the process by which the permit to appropriate water is secured. That is made clear by the text and position of section 1360 in the statutory scheme.

The Water Code provisions pertaining to the sequence of procedures and actions for the appropriation of water are grouped in 11 chapters of division 2, part 2. The organization of the provisions parallels the order in which actions must be taken to obtain a right to appropriate water, i.e., application, permit, and license. Section 1360 is part of the provisions concerning the first step, application for a permit, and immediately follows the sections which govern the hearings which the Water Board must conduct upon such an application. Accordingly, the antecedent reference for the term "application" in section 1360 is "applications for permits to appropriate water" in section 1250. Similarly, the antecedent reference for the term "final action by the board" is section 1350 which does *not* pertain to board action on licenses: "The board may grant, or refuse to grant a permit and may reject any application, after hearing."

The pertinent provisions relating to licenses are to be found in sections 1615 to 1618. Section 1615 provides: "The holder of any permit to whom the board has issued a license for an amount of water or a season of use less than specified in the permit, may, within 30 days after such issuance, file a petition for a writ of mandate in the superior court, to inquire into the validity of the order of the board." In a similar manner, section 1677, which follows the statutes addressed to the *revocation* of licenses by the Water

Board, provides; "Any petition for a writ of mandate to inquire into the validity of an order of the board revoking a license shall be commenced within 30 days after the service of notice of revocation on the license." Hence, section 1360 is not a statute of limitations applicable to these licenses and none of the potential limitation-of-action provisions in the Water Code pertain to petitioners.

Failing this argument, Water Board suggests that, if section 1360 is not an applicable statute of limitations, more general provisions of the Code of Civil Procedure apply, specifically section 338, subdivision (a) (three years for a liability created by statute) or 343 (four years for relief provided by other statutes) are applicable. This claim could tender a material defense if plaintiffs sought a remedy for past usage of water taken under the licenses. But that is not the case.

The purpose of section 5946 is to obtain the release of sufficient water in the future to sustain fish in streams in District 4½ from which water is appropriated. That is to say, the purpose is to maintain fisheries in such streams on an ongoing basis. Hence, the failure to affix to the licenses language conditioning future diversion upon such releases presents a continuing violation of the statute as to which no statute of limitations prevents remediation.

■■■ "[N]otwithstanding the positive and comprehensive language of [Code of Civil Procedure] sections 343 and 363, if taken literally, there can be no doubt that they cannot apply to all special proceedings of a civil nature. . . . from the very nature of [certain] proceedings it is obvious that [they could not] be subject to such limitation." (*Estate of Hume* (1918) 179 Cal. 338, 342-343 [176 P. 681].) The proceeding here is of such a nature that it is outside the ambit of the generic statutes of limitation which the Water Board proffers.

The situation is similar to that which arises when a nuisance has been maintained for a protracted period of time. ■■■ If the nuisance is the sort of ongoing conduct that can be discontinued by an order to stop acts or omissions it is viewed as "continuing" and hence "abatable," despite the fact that the acts or omissions have been conducted for a period beyond that of the pertinent statute of limitations. (See e.g., *Guttinger* v. *Calaveras Cement Co.* (1958) 160 Cal.App.2d 460, 461-462 [325 P.2d 145]; *Mattos* v. *Mattos* (1958) 162 Cal.App.2d 41, 43 [328 P.2d 269].) The same principle has been applied to other ongoing wrongs, e.g., failure to pay child support (*Fernandez* v. *Aburrea* (1919) 42 Cal.App. 131, 132 [183 P. 366]) and improper exercise of a franchise (*People* v. *Stanford* (1888) 77 Cal. 360, 378

[19 P. 693] [opn. of McKinstry, J. for a department of the Supreme Court, superseded on other grounds; *id.,* at pp. 370-371].)

 Another way of viewing the matter leads to the same conclusion. As related, the Water Board suggests that section 5946 should be viewed as a specific rule concerning the public trust, relying upon *Audubon* and *People* v. *Truckee Lumber Co.* This point appears to rest upon the premise that non-navigable streams are subject to a variety of public trust interest for certain purposes. This point was left open in *Audubon, supra,* 33 Cal.3d at page 437, footnote 19. However, as we shall show, the gist of this suggestion is valid, albeit we must condition our acceptance with a cautionary note concerning the ramifications of the term "public trust" in this context. As appears, since the rule in section 5946 pertains to a public trust interest no private right in derogation of that rule can be founded upon the running of a statute of limitations, for the same reasons that one may not acquire an interest in public lands by means of adverse possession.

The Water Board's suggestion that section 5946 is a public trust rule rests principally upon *People* v. *Truckee Lumber Co., supra,* 116 Cal. 397. In that case the Attorney General had obtained an injunction on a nuisance theory prohibiting the Truckee Lumber Company from allowing refuse matter from its sawmill and box factory from passing into the waters of the Truckee River. The lumber company argued that the injunction was inappropriate because there was no infringement of any public right. It argued that the right to take fish is a public right only so far as it pertains to navigable waters and that since the Truckee River was not navigable there was no injury to the public. (*Id.,* at p. 400.) The Supreme Court answered as follows. "In the first place, the common right to take fish extends not alone to navigable waters, but exists as to all waters, the lands underlying which are not in private ownership—in other words, to all lakes, ponds, or streams, navigable or otherwise, upon the public lands of this state or the United States not protected by reservation; and since there is no averment that the lands along the Truckee River are held in private proprietorship, we think the presumption must be that the title remains in the government. [¶] But, in the next place, if this is not the presumption, the case would not be different. The dominion of the state for the purposes of protecting its sovereign rights in the fish within its waters, and their preservation for the common enjoyment of its citizens, is not confined within the narrow limits suggested by defendant's argument. It is not restricted to their protection only when found within what may in strictness be held to be navigable or otherwise public waters. It extends to all waters within the state, public or private, wherein these animals are habited or accustomed to resort for spawning or other purposes, and through which they have freedom of

passage to and from the public fishing grounds of the state. To the extent that waters are the common passageway for fish, although flowing over lands entirely subject to private ownership, they are deemed for such purposes public waters, and subject to all laws of the state regulating the right of fishery." (*Id.,* at pp. 400-401.)

From the foregoing we conclude that a variety of public trust interests pertain to non-navigable streams which sustain a fishery. (See Walston, *The Public Trust Doctrine in the Water Right Context: The Wrong Environmental Remedy* (1982) 22 Santa Clara L.Rev. 63, 85.) This conclusion is consistent with and supported by various elements of California law. Wild fish have always been recognized as a species of property the general right and ownership of which is in the people of the state. (*People* v. *Stafford Packing Co.* (1924) 193 Cal. 719, 727 [227 P. 485]; also see e.g. *Geer* v. *State of Connecticut* (1895) 161 U.S. 519 [40 L.Ed. 793, 16 S.Ct. 600] tracing the roots of this doctrine from ancient Greek and Roman law; see generally, Cal. Const., art. I, § 25.) "The title to and property in the fish within the waters of the state are vested in the state of California and held by it in trust for the people of the state [citations]." (*People* v. *Monterey Fish Products Co.* (1925) 195 Cal. 548, 563 [234 P. 398, 38 A.L.R. 1186].) This trust interest is the basis of the holding in People v. *Truckee Lumber Co., supra.* (*People* v. *Stafford Packing Co., supra,* 193 Cal. at p. 727.)

It does not follow from the application of the term "public trust" to the state's interest in fisheries of non-navigable streams that all of the consequences of the public trust doctrine as applicable to navigable waters also apply to non-navigable streams. For example, the beds of non-navigable streams are not owned by the state based upon a public trust fishery interest. The consequences of characterizing an interest of the state as a trust interest are not uniform. For example, in *Ivanhoe Irr. Dist.* v. *All Parties* (1957) 47 Cal.2d 597, 620 [306 P.2d 824] the Supreme Court called the relationship of the state to all of its waters trusteeship rather than ownership. However, this did not mean that all of the technical consequences of the law of trusts were to be imported to displace the law of water rights. (See Trelease, *Government Ownership and Trusteeship of Water* (1957) 45 Cal.L.Rev. 638.)

Nonetheless, while the fact that "public trust" as to fishery in non-navigable waters does not import the full denotation of "public trust" as to navigable waters, it does share at least one significant pertinent connotation of the term. The "public trust" interest as to fishery in a non-navigable stream is in the nature of a state "property" interest. One may not oust the state from such an interest by operation of a statute of limitations. (See e.g.,

*People* v. *Kerber* (1908) 152 Cal. 731, 732-736 [93 P. 878].) The reason for this is similar to that which underpins the limitations on estoppel against the state, discussed *ante*. " 'The public is not to lose its rights through the negligence of its agents, nor because it has not chosen to resist an encroachment by one of its own number, whose duty it was, as much as that of every other citizen, to protect the state in its rights.' " (*Id.,* at p. 734.)

Here the Legislature in section 5946 enacted a specific rule concerning the public trust interest in fisheries in District 4½. An encroachment on the public trust interest shielded by that rule cannot ripen into a contrary right due to lapse of any statute of limitations. Accordingly, for all the foregoing reasons we reject the contention of the Water Board that Code of Civil Procedure section 338 or 343 bars relief in this proceeding.

The relief sought by plaintiffs is wholly forward looking. They do not seek to recover water misallocated in the past or to adjust future releases in recognition of that fact. Rather, they seek to have section 5946 applied, wholly *prospectively,* to L.A. Water and Power's licenses by removing the Water Board's imprimatur of their validity. The Water Board concedes it has the authority to do so and no private rights sanctioned by a statute of limitations preclude such action. Water Board, having conceded the merits of plaintiffs' claim, recognizes a plain legal duty on its part to correct the licenses so as to condition them upon compliance with section 5937.

The jurisdiction of the Water Board to take such action is not limited to that which generally subserves the public trust doctrine. In *Audubon* the Supreme Court implied from the legislative grant of broad substantive authority to the Water Board a commensurate procedural power, under Water Code section 2501, to reconsider water rights previously granted in the light of a "legislative mandate," e.g., to reconsider the kind of rights here in issue. (33 Cal.3d at pp. 448-449.) In so doing the Supreme Court acknowledged difficulties in justifying a textual basis in section 2501 for this action. Nonetheless, in order to allow the Water Board to carry out "the legislative mandate" the Supreme Court read the statute broadly to avoid a procedural gap. (*Ibid.*) The same reasoning applies to this case.

The legislative mandate of section 5946 was either overlooked or misconstrued in the actions of the Water Board granting the licenses in issue. We agree with the Water Board that the mandate of section 5946 is a specific legislative rule concerning the public trust. Since the Water Board has no authority to disregard that rule, a judicial remedy exists to require it to

carry out its ministerial functions with respect to that rule. The Legislature, not the Water Board, is the superior voice in the articulation of public policy concerning the reasonableness of water allocation. The unfortunate fact that the Water Board did not hear the Legislature's voice in 1974 does not warrant, by the passage of time, its turning a deaf ear now.

## VII

### The Remedy

It remains for us to consider the impact of these conclusions on the relief sought by the plaintiffs. As noted the plaintiffs seek a writ commanding the Water Board to condition licenses 10191 and 10192 by the provisions of section 5946. We agree that application of the rule will require reduced diversions of water from the Mono Lake tributary creeks, albeit in an amount that cannot be precisely calculated on the record before us. The relief required here is limited to attachment of the appropriate conditions. We may assume that L.A. Water and Power will adhere to such conditions in the future in the same manner as if the licenses had initially contained the conditions. Whether and to what extent enforcement proceedings might be necessitated is a matter which is not before us.

California Trout suggests that the application of section 5946 will also require that water be released into the Owens River Gorge. But the two licenses at issue do not pertain to appropriation of water that otherwise would have been available to sustain fish in the Owens River Gorge. The dams referred to in section 5937, as imported into section 5946, are dams placed at the point of diversion of the water which is appropriated. Section 5946 does not promulgate a rule that is germane to every existing dam along the course of waterways that appropriated water traverses *after* it has been diverted. Hence, there is no merit in the contention that conditioning these two licenses has any bearing upon fish habitat below Long Valley Dam.

### Disposition

The judgments of dismissal of the petitions for writs of mandate are reversed. The trial court shall issue appropriate writs, commanding the Water Board to exercise its ministerial duty to attach the conditions re-

quired by section 5946 to licenses 10191 and 10192 as that section is construed in this opinion.

Puglia, P. J., and Evans, J., concurred.

A petition for a rehearing was denied February 22, 1989, and the petition of real parties in interest for review by the Supreme Court was denied April 26, 1989. Lucas, C. J., did not participate therein.

APPENDIX